# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 4, 2012 Session

## STATE OF TENNESSEE v. JUSTIN GRAY

**Appeal from the Circuit Court for Madison County**
**No. 10-152      Roger A. Page, Judge**

**No. W2011-01059-CCA-R3-CD  - Filed February 6, 2013**

The defendant, Justin Gray, was convicted by a Madison County Circuit Court jury of first degree felony murder and especially aggravated robbery and sentenced to concurrent terms of life imprisonment and fifteen years, respectively.  On appeal, he argues that:  (1) it was error for his case to be transferred to circuit court; (2) the evidence is insufficient to sustain his convictions; and (3) the trial court's jury instruction on criminal responsibility was erroneous.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and JEFFREY S. BIVINS, JJ., joined.

Lance R. Chism, Memphis, Tennessee (on appeal); and Angela J. Hopson, Jackson, Tennessee (at trial), for the appellant, Justin Gray.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

After the sixteen-year-old[1] defendant's case was transferred from juvenile court to criminal court, he was indicted on charges of first degree felony murder and especially

---

[1] The defendant was fifteen years old at the time of the offenses and sixteen at the time of the transfer hearing.

aggravated robbery, arising out of the robbery and shooting of a locksmith, Troy Mitchell, who was working on a car at the Guardian Courts Apartments in Jackson.

At trial,[2] Ashley Washington testified that, in October 2009, she was having difficulties starting her yellow Chevrolet Cavalier. A mechanic advised her that something might be wrong with the ignition switch and referred her to a locksmith, the victim. She arranged for the victim to work on her car on October 28, 2009, at the Guardian Courts Apartments, where her boyfriend lived. Her car was parked directly in front of the back apartments, and there was an unobstructed view from the back apartment to her car. On the morning the victim was working on her car, Washington received a phone call while she was in class informing her that the victim had been robbed. She later found out that the victim had been shot.

Johnnie McKinnie testified that on October 28, 2009, he was providing maintenance services at the Guardian Courts Apartments. He recalled seeing a locksmith's van in the parking lot that day. He had to ask the owner of the van, the victim, to move the van so he could tow his coworker, Daryl Kizer's, car through. The victim complied, and McKinnie pulled Kizer's car up the hill where Kizer was able to start it. As McKinnie was disconnecting the tow chain, Ameale Hudson, known as "Pistol," rushed over, shirtless, and began pushing on Kizer's car, saying, "'Y'all hurry up. . . . These peoples got to go to work. These kids got to go to school.'"

McKinnie testified that Hudson's bedroom window was open, and Hudson was giving hand signals to a tall young man of medium build, identified as the defendant, standing inside who appeared to be "waiting on directions." McKinnie also saw someone else in the room but not clearly enough to identify the person. McKinnie was familiar with Hudson's apartment because he had recently been there to perform some repairs. Hudson was signaling at the back of his head and appeared to be signaling "wait a minute" or "stop[.]" McKinnie recalled seeing the locksmith's van and a yellow Cavalier in the vicinity. The yellow car was parked directly in front of Hudson's bedroom window. After he finished helping Kizer with his car, McKinnie left the scene. He did not witness the victim get robbed and shot. McKinnie later picked both the defendant and Hudson out of photographic arrays.

On cross-examination, McKinnie acknowledged that there was nothing in either of his handwritten statements to the police about Hudson's giving hand signals. However, he maintained that "the hand signals w[ere] there. They w[ere] used." He said that the hand

---

[2] The record in this case is voluminous; thus, we will limit our recitation of the facts to that relevant to the issues on appeal.

signals "could have been gang signals," but he admitted that he did not know what the hand signals meant.

Daryl Kizer testified that, on that day, he reported to work at the Guardian Courts Apartments. He had to get McKinnie to tow his car to level ground because it was parked on an incline and would not start as he was low on gas. As Kizer's car was being towed, Hudson "came out from . . . between the buildings," put his hands on top of the car, and said, "Hurry up, man. Get your car out of the way. My mama got to go to work." Kizer thought that Hudson seemed "a little bit jittery." Once Kizer's car was disconnected, he left the area. Kizer later identified Hudson from a photographic array.

Montrez McAlister testified that, on October 27, 2009, the night before the victim was shot, he spent the night with a female friend named Monique. The next morning, around 8:00 a.m., Hudson knocked on Monique's door, and McAlister left with him. McAlister had known Hudson for about one week. They walked to Hudson's apartment for McAlister to drop off his clothes, and then they walked to "Sheena's" house. Sheena was Hudson's cousin and another of McAlister's female friends. After spending thirty minutes at Sheena's house, the two walked back to Hudson's apartment.

McAlister testified that, when they arrived at Hudson's apartment, the defendant, whom McAlister had known for about a week, was getting out of bed. The defendant put on a blue bandana over his nose and mouth like a mask and a black coat with a hooded, pullover sweatshirt underneath. He was also wearing black jeans and black Nike Air Force 1 tennis shoes. Hudson handed the defendant a black .22 or .25 caliber gun and told him, "When he finished handling their business, 'Put the gun back in the house, we're going to walk off.'" The defendant then left. McAlister asked another man who was in the apartment what was about to happen, and the man replied, "I guess they about to do something stupid."

McAlister testified that, about a minute after Hudson gave the defendant the gun, he heard a "loud shattering noise," possibly a gunshot, and looked out the window. He saw the defendant "reaching out [of] the [yellow] car like he w[as] pulling something out on the driver's side." However, McAlister admitted that he did not actually see the defendant rob or shoot anyone. The defendant ran back toward Hudson's apartment, took off the bandana, and threw it in the apartment. He also "threw something else," possibly the gun, into the apartment. The defendant and Hudson then walked quickly toward the street. McAlister left and went back to Monique's apartment. McAlister later identified the defendant and the other man who was inside the apartment from photographic arrays.

McAlister acknowledged that he was not entirely truthful in his statement to the police, explaining that he did not want to place himself in Hudson's apartment. McAlister

admitted that, in his first statement to the police, he did not mention that he saw the defendant reaching in the yellow car, although he did mention that in his second statement. He also admitted that, in his first statement, he told the police that he did not hear a gunshot until he was walking back toward Hudson's apartment after spending an hour and fifteen minutes at Monique's.

Darlene Echols testified that, on the morning of October 28, 2009, she was standing on the porch of her apartment at the Guardian Courts Apartments when she saw two men running away from the apartments toward a blue house across the street on Hollywood Drive, looking back as they ran. She recognized that sort of running as an indication that they had done something wrong or were running from the police. She had seen both of the men before, identifying them as Hudson and the defendant. Noticing that the police were starting to gather at the apartments, Echols went to see what was going on. When she returned to her apartment about thirty minutes later, she saw Hudson get in a silver or gray car with a girl and drive away quickly, "[l]ike they were trying to get away[.]" She did not see where the defendant went. Echols later identified Hudson and the defendant from photographic arrays.

Jasmine Carlson testified that she was dating Hudson in October 2009 and that Hudson spent the night with her on October 27th. The next morning, Carlson took Hudson to his mother's apartment at the Guardian Courts Apartments before going to her 8:00 a.m. class. Later that day, sometime after 1:00 p.m., Carlson picked up Hudson in her silver Pontiac. Carlson said that she knew the defendant, having met him in early October 2009 through Hudson. Carlson knew Hudson and the defendant to be friends, and Hudson even referred to the defendant as "his little brother." She later identified the defendant from a photographic array.

Officer Ted Maxwell of the Jackson Police Department responded to a shots-fired call at the Guardian Courts Apartments on October 28, 2009. When he arrived, he saw a number of people standing around a yellow Chevrolet Cavalier. He saw a man sitting on the pavement with his back propped up against the car and blood streaming down his forehead. The man made unintelligible attempts to speak. Other officers and emergency personnel arrived on the scene. Paramedics wiped blood off the victim's face, revealing "a hole around the bridge of his nose." The victim was transported to the emergency room. He was pronounced brain dead late the next day and remained on life support until his organs could be harvested.

Investigator Chris Chestnut of the Jackson Police Department also responded to the shooting call. The victim was being loaded into the ambulance when he arrived. Investigator Chestnut photographed the victim being loaded into the ambulance and then

went to the hospital where he was able to take a quick photograph of the victim as he was being taken for a CAT scan. Later, Investigator Chestnut participated in the canvass of the apartment complex where he photographed apartment 210 and collected a cell phone from a bathroom drawer. He also found a blue Carhartt jacket on the floor of the linen closet in the bathroom area. Investigator Chestnut noted that apartment 210 was the corner apartment on the opposite end of the building complex from where the victim, his van, and the yellow Cavalier were found. The victim was found in front of apartment 220, an apartment belonging to Dorothy Hudson and her son, Ameale Hudson.

Sergeant Michael Doran of the Madison County Sheriff's Office also assisted in canvassing the area of the apartment complex where the shooting occurred. The officers checked several vacant apartments. In one of those apartments, apartment 210, Sergeant Doran found a Samsung cell phone, identified as the victim's, in a bathroom drawer.

Lieutenant Mike Turner of the Jackson Police Department photographed the crime scene and searched for pertinent evidence. He recovered an empty black canvas cell phone pouch from the driver's side floorboard of the yellow Cavalier.

Larry Joe Mitchell, the victim's son, identified the victim's cell phone that was recovered after the robbery. He said that the victim typically carried a wallet and that, to his knowledge, the police never recovered it. He recalled that the victim normally kept no more than $20 or $40 in his wallet.

Eric Jones, principal of Jackson-Central Merry High School, testified that the defendant was suspended and thus not in school on October 28, 2009.

Lieutenant Christopher Wiser and Sergeant Charles Mathis of the Jackson Police Department both testified as to their participation in the execution of a search warrant at the defendant's residence at 1221 Hollywood Drive, which was up and across the street from the Guardian Courts Apartments. In what was believed to be the defendant's bedroom based on a school report and letter found in the room, the officers recovered a .22 caliber bullet, a blue bandana, and some black jeans.

Larry Swift, a detention monitor at the Madison County Juvenile Detention Center, testified that he turned over the shoes the defendant was wearing when he was brought into custody to Investigator Danielle Jones with the Jackson Police Department. Investigator Jones identified the defendant's shoes, black Nike tennis shoes.

Investigator Terry Buckley of the Jackson Police Department testified that he was involved in the investigation of the victim's death and interviewed the defendant after his

arrest. After being apprised of his constitutional rights, the defendant gave a statement to Investigator Buckley and Lieutenant Miller at 2:12 p.m. on November 6, 2009. In that statement, the defendant denied witnessing or participating in the shooting of the victim, claiming that he was at home at the time and did not learn that a shooting had occurred until hearing about it from his mother the following day. A short break was taken after the first statement, during which the officers told the defendant that they knew he was not being completely honest with them and "indicated some things that [they] knew that he might not have thought [they] knew when he gave . . . the first statement."

At 2:45 p.m. the defendant gave a second statement. In his second statement, the defendant said that he spent the night before the shooting at Hudson's apartment. He claimed that he woke up between 9:30 and 10:00 a.m. to the sound of a gunshot and looked out the window to see "a black subject wearing a checkerboard jacket and a blue bandana around their face" running toward the building behind Hudson's apartment and up the steps. He said that he sat in the living room of Hudson's apartment for fifteen to twenty minutes and then walked to his house when the emergency personnel arrived. He stated that Hudson and McAlister were still at Hudson's apartment when he left.

Willie Bond, a detention monitor with the Madison County Juvenile Detention Center, testified that, while the defendant was in the detention center, he asked Bond to tell Lieutenant Miller that the defendant wanted to speak to him. The defendant's request was conveyed to Lieutenant Miller.

Lieutenant Tyreece Miller with the Jackson Police Department testified that he had the defendant transported to the police department in response to the defendant's request to speak to him. He advised the defendant of his rights, and the defendant gave his third statement. In this statement, the defendant said that he spent the night before the shooting at Hudson's mother's apartment, and McAlister and Cornelius Roberson were also present. He stated that Hudson woke him up the next morning, saying that "he had an easy way for [the defendant] to come up on a couple of hundred dollars. He said there's a white boy outside that you can rob. You can use my gun." The defendant said that he looked outside and saw a white man working on a yellow car. The defendant claimed that he asked Hudson why he did not do it himself if it was so easy. He said that he lay back down for ten or fifteen minutes, when Hudson came back in and said that he was about to leave and that the defendant needed to leave as well. The defendant stated that he and Hudson went their separate ways, with him walking to his home.

Dr. Laura Boos, a serology/DNA analyst with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory, testified that she tested the cell phone and blue coat found in apartment 210; buccal swabs from the defendant, Hudson, McAlister, and Cornelius

-6-

Roberson; and a blood sample from the victim. On the cell phone, Dr. Boos found a "DNA profile . . . consistent with a mixture of genetic material from at least two individuals." The victim was the major contributor to the DNA profile. The defendant was not excluded as the minor contributor to the profile, although Hudson, McAlister, and Roberson were excluded. Dr. Boos also obtained a DNA mixture from the blue coat. Roberson was the major contributor to the profile. McAlister and the victim were excluded as minor contributors to the profile, but the defendant and Hudson were not excluded.

Dr. Julie Heinig, an assistant laboratory director at a private DNA testing company, testified that her company was hired by the State of Tennessee to conduct independent DNA testing on the victim's cell phone. Her testing revealed a mixed DNA profile, with the major contributor being consistent with the victim's DNA and minor contributor being consistent with the defendant's DNA. The probability of someone other than the victim contributing to the major profile was one in fifty-seven billion, and the probability of someone other than the defendant contributing to the minor profile was one in one-hundred and thirty-thousand. Dr. Heinig said that there was additional DNA present on the cell phone that was not consistent with either the victim or the defendant.

Dr. Feng Li, a senior associate medical examiner for Davidson County, performed the autopsy on the victim. Dr. Li observed a gunshot wound along the left side of the victim's nose and concluded that it was the cause of the victim's death. He opined that the nature of the wound appeared to be consistent with a small or medium caliber weapon and that the shot was fired from between a few inches away to three feet away. There was no exit wound, and he recovered two bullet fragments within the victim's body.

Following the conclusion of the proof, the jury convicted the defendant, as charged, of first degree felony murder and especially aggravated robbery.

## ANALYSIS

The defendant raises three issues on appeal. He argues that: (1) it was error for his case to be transferred to circuit court; (2) the evidence is insufficient to sustain his convictions; and (3) the trial court's jury instruction on criminal responsibility was erroneous.

### I. Transfer

The defendant challenges the transfer of his case to circuit court from juvenile court.

On December 9, 2009, the juvenile court heard the State's motion to transfer the

defendant's case to circuit court. The court noted that the defendant had undergone a mental evaluation and that it was determined that the defendant had sufficient ability to consult with his attorney with a reasonable degree of rational understanding and functional understanding of the proceedings against him. The evaluator concluded that the defendant did not meet the standards for commitment to a mental health institution. The court then reviewed the standards for transfer to circuit court from juvenile court, as well as the defendant's criminal record, which included aggravated burglary, theft of property under $500, possession of a weapon with an altered serial number, possession of a stolen vehicle, and theft of property over $1000. The court noted that the defendant had an I.Q. of 86 and that he tested positive for marijuana at the time of his arrest.

McAlister, McKinnie, and Lieutenant Miller all testified at the transfer hearing, each substantially similar to his testimony at trial. Relevant to this issue, McKinnie testified that the hand signals Hudson gave to the defendant appeared to be gang signals, but he admitted that he was not the member of a gang or an expert on gang signs.

At the close of the hearing, the court found that the State had established probable cause, that "there is enough proof to show that the criteria for the statute have been met in regard to the charges." The court noted that "[t]his was obviously premeditated." The court observed that it had no doubt the incident was gang-related but said it was "not going to make the finding it was gang related." The court concluded that the State had established every necessary element for transfer to circuit court, noting, "We've tried probation, we've tried to help him get off drugs. He was still positive for marijuana. . . . This was aggressive and committed in an aggressive manner." Accordingly, the court ordered that the defendant be transferred to circuit court to be tried as an adult.

A juvenile court may transfer a child under the age of sixteen to the criminal court to be tried as an adult if the child is alleged delinquent and charged with one of several listed crimes, including first degree murder and especially aggravated robbery. Tenn. Code Ann. § 37-1-134(a)(1). Before such transfer can occur, the juvenile must be provided with notice and a hearing on the transfer. Id. at (a)(2), (3). During the hearing, the juvenile court must find "reasonable grounds to believe" that the juvenile committed the delinquent act as alleged, that the juvenile "is not committable to an institution for the developmentally disabled or mentally ill," and that the community's interests require legal restraint or discipline of the juvenile. Id. at (a)(4)(A)-(C). In considering whether to transfer the juvenile to criminal court, the juvenile court shall consider the following factors:

(1) [t]he extent and nature of the child's prior delinquency records;

(2) [t]he nature of past treatment efforts and the nature of the child's response

thereto;

(3) [w]hether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4) [w]hether the offense was committed in an aggressive and premeditated manner;

(5) [t]he possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) [w]hether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

Id. at (b)(1)-(6).

On appeal of an order of transfer from juvenile court, we do not decide where the preponderance of the evidence lies, but whether there were reasonable grounds for the juvenile court judge to believe that the three criteria of section 37-1-134(a)(4)(A)-(C) mentioned above were present. See State v. Strickland, 532 S.W.2d 912, 920 (Tenn. 1975); State v. Layne, 546 S.W.2d 220, 224 (Tenn. Ct. App. 1976). A juvenile court judge's discretionary decision to allow a juvenile to be treated as an adult should not be disturbed on appeal, if there was probable cause to believe that the juvenile committed the crime and the evidence at the hearing showed that the juvenile was not mentally impaired and should be legally restrained. See State v. Mario A. Reed, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6 (Tenn. Crim. App. Aug. 31, 2010), perm. app. denied (Tenn. Jan. 13, 2011); State v. Cecil L. Groomes, et al, No. M1998-00122-CCA-R3-CD, 2000 WL 1133542, at *7 (Tenn. Crim. App. Aug. 10, 2000) (citing State v. Orange, 543 S.W.2d 344, 346-47 (Tenn. Ct. App. 1976)).

The defendant disputes the juvenile court's findings in basically every regard. He asserts that the court erred in concluding that there were reasonable grounds to believe that he committed the offenses and that the interests of the community require that he be put under legal restraint or discipline. He also asserts that many of the factors in section 37-1-134(b)(1)-(6) actually weighed in favor of retaining him in the juvenile court system. We note that, even though the juvenile court did not specifically go through each of the factors line by line, it referenced the statute in making its findings and was clearly cognizant of the standards for transfer to circuit court from juvenile court.

At the transfer hearing, the juvenile court heard testimony from McAlister, McKinnie,

and Lieutenant Miller. This testimony was substantially similar to their testimony at trial, which, as we will address below with regard to sufficiency, established the defendant's guilt beyond a reasonable doubt, with the help of other evidence. At the hearing, the State only had to prove the much lower standard of probable cause that the defendant committed the crimes. Testimony that Hudson was seen giving hand signals to the defendant, and the defendant was seen donning a bandana over his mouth, receiving a gun from Hudson who "told him to just put it back in the house when he g[o]t through handling his business," and pulling something out of the car the victim was shot in immediately after "a loud noise like something shattered" easily cleared the hurdle of probable cause.

In addition, the court was presented with evidence that the defendant was not mentally impaired and that he should be legally restrained. In determining that the necessary elements for transfer had been met, the court reviewed the defendant's juvenile criminal record, including that he had "violated prior orders of probation in this Court." The court also noted that the offense was against a person and was committed in an aggressive and premeditated manner. We cannot conclude that the evidence preponderates against the juvenile court's findings in transferring the case to circuit court.

## II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. He asserts that he never admitted to robbing or shooting the victim and that the incriminating testimony of McAlister and McKinnie was not credible or conclusive. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every

other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2010). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts." Id. § 39-13-202(b). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999).

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. § 39-13-403(a).

In the light most favorable to the State, the evidence is sufficient to support the

defendant's convictions. McKinnie testified that, after he encountered Hudson while towing Kizer's car, he noticed Hudson giving hand signals to the defendant who was standing just inside Hudson's open bedroom window and appeared to be "waiting on directions." Hudson was signaling at the back of his head and appeared to be signaling "wait a minute" or "stop[.]"

McAlister testified that he saw Hudson give the defendant a small caliber gun and say, "When he finished handling their business, 'Put the gun back in the house, we're going to walk off.'" The defendant put on a blue bandana over his nose and mouth like a mask and a black coat with a hooded pullover sweatshirt underneath and then left. About a minute after Hudson gave the defendant the gun, McAlister heard a "loud shattering noise," possibly a gunshot, and looked out the window. He saw the defendant "reaching out [of] the [yellow] car like he w[as] pulling something out on the driver's side." McAlister saw the defendant run back toward Hudson's apartment, take off the bandana, and throw it in the apartment. The defendant also "threw something else," possibly the gun, into the apartment. The defendant and Hudson then walked quickly toward the street. On the morning of the shooting, Echols was standing on the porch of her apartment at the Guardian Court Apartments when she saw the defendant and Hudson running away from the apartments toward a blue house across the street on Hollywood Drive, looking back as they ran. She recognized that sort of running as an indication that the men had done something wrong or were running from the police.

The evidence showed that the victim was shot in the face with a small caliber gun and died from his injuries not long thereafter. The evidence also showed that the victim's cell phone and wallet were stolen. The cell phone was later recovered from a vacant apartment and bore DNA that did not exclude the defendant as a contributor. Black jeans and a blue bandana were recovered from the defendant's house, as was a pair of black Nike tennis shoes from the defendant at the detention center, all consistent with McAlister's testimony of the defendant's apparel the day of the shooting. In his final statement to the police, the defendant admitted that Hudson encouraged him to rob the victim and offered the use of his gun, but he claimed that he did not do so. The jury was free to believe or disbelieve all or part of the defendant's statement and, accordingly, could accredit the part about the plan and gun but discredit the defendant's disavowment of responsibility.

The credibility of the witnesses was a determination for the jury, which we will not second-guess on appeal. Moreover, it was the prerogative of the jury to determine the weight given the circumstantial evidence and the extent to which the circumstances were consistent with the defendant's guilt. We conclude that the direct and circumstantial evidence is sufficient for a rational trier of fact to find that the defendant intended to rob the victim, he in fact robbed the victim, and he fatally wounded the victim in the process.

-12-

## III. Criminal Responsibility

The defendant argues that the trial court erred in its instruction to the jury on criminal responsibility. He concedes that he failed to object to the instruction or raise the issue in his motion for new trial but asks this court to consider the issue under the doctrine of plain error.

In order for us to find plain error:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

Tennessee Code Annotated section 39-11-402 provides:

A person is criminally responsible for an offense committed by the conduct of another, if:

(1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Id.

In this case, the trial court charged the jury on the theories of criminal responsibility in subsections (1) and (2). At issue here, the court charged, without objection: "The [d]efendant is criminally responsible for an offense committed by the conduct of another if, acting with the culpability required for the offense, the [d]efendant causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense."

The defendant argues that this particular subsection of the criminal responsibility instruction was inapplicable to the facts of his case and, thus, potentially confusing to the jury. We agree that the instruction was not applicable to this case. However, consideration of the error is not necessary to do substantial justice as it is our view the error did not change the outcome of the trial.

The State did not mention in its opening statement that proof would be presented on a theory of criminal responsibility for the defendant's guilt. In fact, the State explicitly stated that the evidence would show that the defendant personally robbed and shot the victim. In addition, contrary to the defendant's creative argument that Hudson could be considered an irresponsible or innocent person, nowhere during the State's presentation of proof did the State put on any evidence suggesting that the defendant caused or aided an innocent or irresponsible person to engage in criminal conduct. Moreover, the State's closing argument did not mention any sort of criminal responsibility theory, thus, directing the jury away from considering criminal responsibility. See State v. Eric Sims, W2011-00678-CCA-R3-CD, 2012 WL 1096097, at *7 (Tenn. Crim. App. Mar. 30, 2012) (noting

-14-

that the State directed the jury in closing argument to the proper subsection of criminal responsibility that was applicable in the case, even though the court instructed the jury on all three subsections), perm. app. denied (Tenn. Aug. 15, 2012).  Furthermore, the evidence against the defendant, albeit largely circumstantial, was very strong.  We conclude that, just as in State v. Hatcher, 310 S.W.3d 788, 814 (Tenn. 2010) and Eric Sims, 2012 WL 1096097, at *7-8, two cases cited by the defendant, any error in the instruction given by the trial court did not change the outcome of the trial.  Thus, the defendant has failed to establish that he is entitled to plain error relief on this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-15-